NelsoN, J.,
dissented, and said:
Various persons, who were creditors of Robert T. Adams in his lifetime, are associated as complainants in the bill first named, against Gibson and the administrator and the heirs at law of said Adams; the objects of which are to effect the collection of their claims by the sale of certain lands conveyed by said Adams, and by others at his instance, to said Gibson, and also of certain personal property for which a bill of sale was executed by said Adams to his son, F. M. Adams. The prayer of the bill is, in the alternative, to set aside the deeds, all of which are absolute, as fraudulent, or that they may be declared mortgages, if they are not fraudulent. Mary A. Adams is the widow of Robert T. Adams, and the objects of her bill and amended bill are, also, to show that the conveyances of the land, though absolute, were in truth and in fact mortgages merely, and to obtain an assignment. of dower therein.
In the bill filed by Turbeville and others, the defendants are required “to answer, upon their corporal oaths, according to the strict rules of your Honor’s *588 Court;” and the said Gibson is required to answer particularly as to the said conveyance of said real property — how much he paid upon each conveyance; whether the same was made to secure him in sums of money, and if so, how much.” ■ As to the deed executed to him by R. T. Adams for one hundred acres, purporting to be in consideration of $2,000, dated and registered 7th June, 1861, he admits that he conveyed the land to W. L. Pryor, and that Pryor re-conveyed it to him on the 10th August, 1866, by a quit claim deed, the consideration of which was $461.70, due by said Adams to said Pryor. As to the deed executed and registered on the said 7th June, 1861, from J. A. Brown to Gibson, purporting to be in consideration of - $1,000, and conveying a tract of one hundred and one acres, he says he does not know that it had been previously mortgaged to Brown, but that the deed was made with the consent of Adams, in connection with other lands, to secure Gibson, as hereinafter stated. In regard to the deed for fifty acres, executed by May Brockwell to said Gibson, bearing date and registered on the said 7th June, 1861, and purporting to be for the consideration of $500, Gibson states that Adams held a title bond for the land and had paid part of the purchase money, but that he, Gibson, paid the residue and held the land as a security. In reference to the deed for fifty acres, bearing date 21st May, 1860, and registered 23d January, 1866, executed by said Adams to said Gibson, and purporting to be in consideration of $510, he states that said tract was sold for a division among *589 tbe heirs of George Gibson, clec’cl, and bought by Adams; that he purchased the same from said Adams at the time and for the consideration stated in the deed, of which he paid $100 to Adams and $410 to Nay, the commissioner. He expressly denies that any of said conveyances were without consideration, or executed for the purpose of hindering and delaying creditors, and makes further and fuller explanations as to some of said debts, not material to be here noticed. He specifies, in his answer, certain debts which were due to him from Adams and others, for which he was liable as the surety of Adams, amoünting in the aggregate and without interest to $443.63, and states that said deeds, with the exception of the deed bearing date 21st May, 1860, which was absolute, were severally executed to secure the amount due him, and the sums for which he was bound as surety, and with the understanding that he, Gibson, should afterward stand as his security, or pay any debt that might be owing by said Nobert T., provided the amount should not exceed the value of the land,. and reconvey -the lands to the said Nobert T. whenever the said Gibson should be released as surety and repaid the amount of his advances. It is admitted in the answer, that the said Nobert T. continued in possession of the lands until his death, and that the conveyances, though absolute on their face, were in fact mortgages. Including the amount due' him, personally, and various other debts paid by him for said Adams, which are particularly specified, said Gibson shows that the amount for which said lands are liable, exclusive of interest, *590 is $1,159.64, less the price of a mule credited at $175, and that the balance due on the foot of the mortgage is about $994.64, as ascertained by a calculation of the sums stated in his answer. He states that none of said indebtedness has been paid, except the said sum of $175.
The answer is fully and directly responsive to the bill. An effort was made to disprove it by various witnesses, but not successfully. Two of the heirs of Adams state that, on the day of their father’s funeral, Gibson, in reply to a question propounded to him when the three were riding together on their way to the grave, stated that their father owed him about $150. Another of the heirs states that, when he returned from the Federal army in 1865, his father desired to borrow $300, which he was unable to loan, and that his father said he owed Gibson that amount and had conveyed his land to him to keep it from being taken for security debts, and that if he could get the money it would release the land. F. M. Adams, another of the heirs, deposes, in substance, that there was an obligation between his father and Gibson, in regard to the land, which Gibson got from him twice and lost; that the obligation recited that Gibson held the land as collateral security for the payment of certain debts, not specified, and was to reconvey when they were paid; that his father was anxious to get the land back, and procured witness to see and converse with Gibson, and that Gibson, said, if the Neese and Williams debts were adjusted, that the matters between them could be arranged at any time be *591 tween themselves; that the parties afterward met in Paris, in January, 1866, with a view to the execution of a title bond by Gibson to the witness and his brother Joe, and that his father said it was not done, because Gibson said there was so large a crowd in town that it could be done at some other time.
It may be remarked in regard to this evidence, that the casual conversation on the day of the funeral and vdiile parties were on their way to the grave, is of but little importance, as it is not probable that on such an occasion Gibson would enter into detail as to the condition of the business, and it is most probable that if he had conversed at all, he would naturally speak of the debt due him personally. The statement of R. T. Adams, that there was due only about $300, does not contradict the answer. It is said to have been made in 1865, but at what time in that year is not shown, and the answer states that the two judgments in favor of Neese were rendered 19th August, 1865, for $243.45, which must have been in addition to the $300 admitted by Adams. The answer states further, that Gibson paid Pryor $471.63 on the 9th August, 1866, which was after the death of R. T. Adams in March, 1866. These sums substantially correspond with the amounts stated in Gibson's answer, and his other payments and liabilities are established by the evidence of Moore, Williams, Porter, Erazier, and Pryor. The evidence of F. M. Adams, as to the condition of the business in January, 1866, is not in material conflict either with the answer :or the statements of the other witnesses, and so far as it proves *592 the contents of the lost obligation or defeasance, accords with the statements of Gibson as to the terms upon which he held the titles to the lands. So far •from. the answer being disproved, it is, in its most important statements, abundantly corroborated and fortified by the evidence in the record.
But it is insisted, that the various conveyances to Gibson are so covered by badges of fraud that they can not be held valid, for any purpose, as against complainants. To sustain this view, it is alleged that the vendor was largely indebted; that the consideration actually existing was inadequate; that it was falsely stated in the deeds, and that the deeds can not, lawfully, embrace advances made subsequent to their execution, upon a secret parol agreement for future advances.
It is somewhat difficult to define with precision the shadowy boundary that lies between instruments fraudulent in law and fraudulent in fact; and it is not necessary to review the numerous decisions heretofore made by this Court, cited by counsel on both sides in argument. For the purposes of this case, it is sufficient to extract the following observations made by Judge Green, and to re-affirm, with such changes of words as are necessary to adapt them to this case, the positions stated by him. He says: “ The doctrine that if the property sold remained in the- possession of the vendor, the sale is, per se, fraudulent, was overruled by this Court in the case of Callen v. Thompson, 3 Yerg., 475, where it is laid down that such possession is only prima facie evidence of fraud, and that *593 tbe bona Jides of the transaction may be shown by proof. We think that any presumption of fraud, from this circumstance, is sufficiently explained and repelled by the proof of fairness as to the real existence of the debts intended to be secured. Besides, that the deeds to Gibson, though absolute on their face, were intended by the parties to constitute one mortgage only. And the possession of the property mortgaged, by the mortgagor, is no evidence of fraud, because it is consistent with the contract. Whenever, therefore, it shall be made to appear that a deed, absolute on its face, was intended by the parties as a mortgage only, the presumption of fraud, that may have existed by reason of the possession of the property by the bargainor, instantly disappears. ***** A debtor is not prevented from preferring a creditor and securing his debt in preference to the claims of other creditors, and a conveyance of his property, bona fide made .for such purpose, is valid. It is not made to hinder and delay creditors, but for the honest purpose of securing the debt of a favorite creditor Wiley v. Lashlee, 8 Hum., 720. See also Hefner v. Metcalf 1 Head, 580; Mitchell v. Beal, 8 Yerg., 142.
Whatever may have been the object of Robert T. Adams in making, or causing to be made, the deeds of conveyance to Gibson, there is no sufficient evidence in the record to disprove Gibson’s denial of any fraudulent purpose; and it should have been shown that both participated in the intent to hinder and delay creditors. - It does not appear that Gibson, at any time, claimed the absolute ownership of the lands, and *594 be seems to have been willing at all times to recon-vey them whenever the debts were satisfied. Although the recital of a fictitious consideration, as the ground of a deed, is evidence of an intention to hinder and delay creditors, it is not conclusive; but the rule in equity, above declared, as to constructive mortgages, will, in its application to the facts of the case, be more fully considered and expounded.
If the question as to whether a deed, absolute on its face, may, under any circumstances, be declared a mortgage, was now for the first time before this Court, we would, in view of the policy of our registration laws, be strongly inclined to hold that it should not be so declared, and that one of the best methods of suppressing fraud would be to consider such a deed fraudulent as to creditors, because of the false assertions contained in it, and good between the parties, without any relief to the bargainor, because .the nature of such a transaction is to deceive and mislead. Such an instrument, when registered, displays false colors to the world, and enables a debtor to secure all the benefits which he usually expects to derive from the most fraudulent conveyance. But, as the question relates to property and titles, and a different rule has been established by this and other tribunals, it would be a public injury to disturb it; and we feel constrained to follow the decisions to their legitimate results. In the language of Judge Caruthers, “such, certainly, has been the uniform holding of our Courts. To change it now would be to shake the rights of property,- and lead to great mischief and confusion Ruggles v. Will *595 iams, 1 Head, 143. And in Willard’s Eq. J., 429, it is said — and numerous authorities are referred to in support of the position — that, “it is well settled, that parol evidence is admissable in a Court of Equity to show that a conveyance, absolute in its terms, was intended as a security for a debt;” and, it is added, that “as between the parties themselves, or purchasers with notice or .without consideration, the true character of the transaction may be shown, notwithstanding the statute of frauds.” See also 2 Story’s Eq., s. 1019; 3 Lead. Ca. in Eq., 3d Am. Ed., 608, 625, 626, 630; Jones v. Jones, 1 Head, 105.
Holding, as already announced, that the deeds to Gibson were not fraudulent, and that he held the lands in mortgage, the questions still recur, were the absolute deeds good only for the amount dire from Gibson, or for which he was liable at the dates of the conveyances? or were they good to cover the future advances mentioned in his answer?
The question, as to how far and under what circumstances an actual mortgage or deed of trust will be held as a security for future advances, has been, on several occasions, before this Court, but has never been fully determined. It was partially considered in Peacock v. Tompkins, Meigs R., 328, 329, Bennet v. Union Bank, 5 Hum., 617; Neiffer v. Pardue, 3 Sneed, 192, 193; Doyle v. Smith, 1 Col., 19; and McGavock and Wife v. Deery, 1 Col., 268, 269. Reference is made in the latter case, to Peacock v. Tompkins, and Neiffer v. Pardue, and the observation is made that “all that is. decided in either case (and that is done *596 in both) is that an assignment will not be held to secure future advances, or subsequent debts, where there is no stipulation to that effect in the deed; that it can not be done by a parol agreement or understanding.” But as the deed in McGavock and Wife v. Deery provided for future advances, it was expressly held in that case, that “ mortgages may as well be given to secure future advances and contingent debts, as those which already exist and are certain and due.” This position is not only sustained by the authorities cited in the opinion, but accords with the doctrine stated in 4 Kent, 175; Hendricks v. Robinson, 2 Johns. Ch. R., 308, 309; Brinkerhoff v. Marvin, 5 J. Ch. R., 326, 327; and James v. Johnson, 6 J. Ch.. R., 429; see also, Willard’s Eq. J., 436, 437. And in the case above cited of Doyle v. Smith, 1 Col., 19, it is said that “a provision in a deed to secure future responsibilities is not necessarily fraudulent. It depends on the bona jides of the transaction. It can not, therefore, be absolutely asserted of such a provision in a deed, that it is fraudulent in law. This is a matter ■of proof and can not be determined on the face of the deed.” Chancellor Kent observes, in James v. Johnson, that it was a rule of the civil law, that if the debtor pledged property to secure a debt, and afterward another debt was contracted, the creditor might retain for both debts, provided there was nothing to negative the presumption of an implied contract that the pledge should be so applied; and he said that the deed, in the case before him, “ being absolute in terms, and the defeasance, by agreement, resting *597 in parol, as a security for future responsibilities, of whatever kind, becomes more easy and flexible; and, as between the parties, it is perfectly plain that it ought to be so held. It is only when the rights of third persons are prejudiced by want of notice, that the extension of the security is prevented:” 6 J. Gh. R,., 429. He had previously said in Brinkerhoff v. Marvin, that “ the limititation to this doctrine, I should think, would be that when a subsequent judgment or mortgage intervened, further advances, after that period, could not be covered”: 5 J. Ch. R., 327.
The conclusions to be deduced from the New York cases as well as our own, are, that where there is a mortgage deed, parol proof will not be heard to establish other debts than those named in it; that" the deed will be good for future advances, if the purpose to secure them is therein expressed, although their amount may not be specified; and that if the deed is absolute on its face, a parol defeasance may be established either as to existing debts or as to future advances, but that this defeasance, while good between the parties, is not valid as to any advances not expressly provided for, made after a subequent judgment or mortgage.
The question still remains, is the parol defeasance to an absolute deed good as to existing creditors at large? If a debtor in failing circumstances may prefer one creditor to another, and if a mortgage is valid as to future advances, why shall not the parol defeasance agreed upon in good faith and without a fraudulent purpose, be as effectual against existing creditors as a *598 mortgage in fact? Can it be urged, with propriety, that the true nature of the transaction is not disclosed to the world? Such is the fact with every absolute deed to which there is a secret written or parol de-feasance. Can it be said that it is good as to debts existing at the time, but not good as to future advances? If this is the case, then the unwritten and unregistered defeasance, which is relied upon to convert the deed into a mortgage, defeats the very purpose for which proof of its existence is admitted. The inevitable result of the doctrine that an absolute deed may be shown by parol to be a mortgage, is to place the mortgage on the same footing precisely as if the verbal conditions had been inserted in the deed; and if future advances may be provided for by a mortgage in fact, no good reason exists why they may not be provided for in a mortgage by equitable construction. These advances must be stipulated for at the time the mortgage is created, just as much in the one case as in the other; and when made in good faith, the conditions are as obligatory in the one case as in the other. In either case, the conditions would be void as to creditors having a judgment lien, but in both they are, as to creditors at large, obligatory and not fraudulent. A mortgage which contains a stipulation for future advances upon its face is declared valid because it- gives notice of the purpose for which the property is held; and in McGavock and wife v. Deery, it was not required that the amount of such advances should be stated in the deed. In the case of an absolute deed, converted by parol proof into a mort *599 gage, the parol evidence supplies the place of the conditions written in the mortgage. It can not be taken in part and rejected in part any more than in the case of a mortgage in fact; and if it shows, as it does in this case, that the property was to be held bound for future advances to the extent of its value, the contract is just as good in the one instance as in the other, and binds the property at least to the amount of the consideration stated in the deed, if the advances are so much. It has been well said, that when the deed is registered, “a subsequent purchaser can not object, because he has notice that the whole estate has passed instead of the imposition of an incumbrance upon it. So, one about to deal with the owner has a stronger warning against extending credit:” Ruggles v. Williams, 1 Head, 144.
It may be further observed upon the case before ns, that if the deed had been executed for a fraudulent or dishonest purpose, the vendee would have insisted, as is usual in such cases, that it was made in good faith and upon full consideration. But the bar-gainee admits that they were a security merely, and the idea of fraud is repelled by the frankness of the admission. In the language of Judge Caruthers, "it may be a circumstance to excite suspicion that, where the object is only to secure debts, a deed, instead of a mortgage or deed of trust, is made and spread upon the records; yet it is not always done in bad faith. The course of our adjudications has been to hold all these securities good so far as they are for an honest purpose, but no further. Upon this policy we have *600 held that a deed of trust, or mortgage, to secure some debts that are fictitious and others real and bona fide, shall be a valid security for the latter, though fraudulent as to the former:" Ruggles v. Williams, 1 Head, 144. See also Alley v. Connell, 3 Head, 582, 583.
From this view of the case, it results that so much of the Chancellor’s decree as declares that the deeds of conveyance to Gibson were fraudulent, is erroneous. But that part of the decree in which it is declared that the absolute deed, or bill of sale, executed by B. T. Adams to his son, F. M. Adams, on the 18th December, 1865, for personal property, is fraudulent and void, will be affirmed. This is proper, although Adams does not appeal, because the entire causes are brought here by • the appeals on the part of the complainants in the original bill, and of the defendant Gibson, from the entire decree in the orignal suit, and by the appeal of Turbeville and others from the decree in Mrs. Adams’ case. It would be useless to review all the evidence in relation to this deed, which is not admitted to be a mortgage, and purports to have been executed in consideration of six hundred and fifty dollars. Suffice it to observe, that the deed embraces corn, hay, fodder, wheat and other articles consumable in the use; that the consideration is only partially proved; that the property, after the alleged sale, was as much in the possession of the vendor as the vendee; that B. T. Adams was greatly embarrassed in his circumstances at the time; that the deed was executed only some three or four months before, and was not witnessed, or proved and registered, until *601 after bis death; and that the object of said deed, as clearly shown by these and other facts and circumstances, was to hinder and delay creditors.
In the case of Mary A. Adams against Gibson and others, it appears that, on the 11th of July, 1861, an agreement was entered into between her and her husband, R. T. Adams, by which it was stipulated that the parties should separate; that they should “no longer consider or claim each other as companions, and that they mutually absolved each other from all matrimonial ties and obligations.” It was further agreed, that the said R. T. was to furnish the • said Mary A. “a certain amount of money and property, named in a memorandum in the hands of Benjamin Turbeville,” and that she accepted the same “ as a full and satisfactory portion of R. T. Adams’ property, and received it as a full and entire dowry, and should hold no other claims against him.” Said instrument .was duly proved by the acknowledgment of R. T. Adams, and the privy examination of his wife on the 20th, and registered 22nd July, 1861.
This agreement, even if it had been made with a trustee, would not bar the wife’s right to dower: see Watkins v. Watkins, 7 Yerg., 283; Parham v. Parham, 6 Hum., 287. As the wife is ordinarily incompetent under the law to make a contract, it may well be doubted whether it was valid, as to her, or could have been enforced against her, but it is not essential in this case to determine a question which has created so much doubt in the English tribunals: see Shelf, on Mar. and Div., 31; Law Lib., 631, 632, marg. As *602 our statute requires the applicant for a divorce to swear that the application is not made out of levity or by collusion, married persons can not divorce themselves by contract, and the agreement in this case is null and void, as being contrary to public policy. If the power of legislation rested, as it does not, in this Court, we should hesitate long before allowing a divorce, or sanctioning a separation, for any cause other than that prescribed by the Divine Lawgiver himself, and would be disposed to adopt the views of Hume and Lord Stowell in preference to those of Milton and Dr. Symmons, as stated in Shelford, 370-374.
In the Code, the former statute, endowing the wife of equitable estates, is re-enacted; and, by sec. 2399, it is declared, that “ she shall also be entitled to dower in lands mortgaged or conveyed in trust to pay debts, when the husband dies before foreclosure of the mortgage or sale under the deed.” We hold that this section extends as well to an absolute conveyance, with a parol defeasance, which, in the view of a Court of Equity, is a mortgage, as to a mortgage in the usual form, and that the wife is entitled, upon an equitable construction of the statute, as well to dower in the one case as in the other.
Decree, therefore, that the absolute title to the land conveyed to Gibson by the deed of 21st May, 1860, was thereby vested in him; that he' held all the other lands as mortgages merely; that the widow is entitled to dower therein; that, after the assignment of her dower, said last named lands, together with the interest in remainder of the dower tract, shall be sold in the *603 usual mode, to be specified in tbe decree, on a credit of six and twelve months; that an account shall be taken as to the amount due Gibson on the claims and payments specified in his answer, and also of the amounts due complainants; that the proceeds of the sales of the land shall be applied, first, to the payment of one-half the costs of these causes in this Court and the Court below; second, to the extinguishment of the amount due Gibson; and third, toward the satisfaction of the claims of complainants. Decree, further, that if it has not been already done under the Chancellor’s decree, F. M. Adams shall account for the value of the personal property conveyed to him, or that the same be sold, at the election of complainants, and the proceeds of sale be applied pro rata among them. Let F. M. Adams pay such of the costs of these causes as have accrued in reference to him, and let all the other costs, in this Court and the Court below, be paid by the complainants, Turbeville and others.
The Chancellor’s decrees, so far as they are in conflict with this opinion, are reversed, and will be modified and affirmed to the extent above directed, and the cases will be remanded to the Chancery Court at Paris, to the end that all proper steps may be there taken toward the execution of the decree of this Court.
Memorandum, 21 June, 1871. .In the division of labor among the Judges, this case was allotted, among others, to me, and this opinion was prepared and submitted to the Judges in council, some weeks *604 since, for adoption as the opinion of the Court, but was not concurred in by a majority. Judge Freeman prepared an opinion in reply to this, which was this day delivered as the opinion of the majority. I, therefore, file this as my dissenting opinion, and this memorandum will explain why the language employed in it seems to be that of the Court, when it is only my own. NelsoN, Judge.